IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-01962 (PAB/KMT)

JOHN DOE,

      Plaintiff,

      v.

UNIVERSITY OF DENVER, *et al.*

      Defendants.

---

**PLAINTIFF JOHN DOE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Plaintiff John Doe ("Plaintiff" or "Doe") hereby moves for partial summary judgment on his Title IX-Erroneous Outcome Cause of Action.

## I.    INTRODUCTION

Plaintiff John Doe was expelled from the University of Denver ("DU") after female student Jane Roe filed a complaint alleging non-consensual sexual contact, arising from a consensual encounter that occurred on the morning of March 5, 2016. The summary judgment record contains extensive evidence establishing gender bias and articulated reasons for DU's decisions that are unworthy of credence and a pretext for discrimination. The record thus establishes "erroneous outcome" Title IX gender discrimination under the *McDonnell Douglas* burden-shifting framework. As detailed below, there are no disputed issues of material fact concerning Plaintiff's Title IX Erroneous Outcome claim and Plaintiff is therefore entitled to partial summary judgment.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    On April 4, 2011, the Office for Civil Rights issued a Dear Colleague Letter ("DCL") which outlined the requirements imposed on educational institutions receiving federal

funding to ensure compliance with Title IX of the Education Amendments of 1972.

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf

2.      The DCL cited to the statistic that "about 1 in 5 women are victims of completed or attempted sexual assault while in college" and explained schools' responsibility to "take immediate and effective steps to end sexual harassment and sexual violence." *Id.*

3.      On April 29, 2014, the Office for Civil Rights issued its Questions and Answers on Title IX and Sexual Violence ("2014 Questions and Answers") to "further clarify the legal requirements and guidance articulated in the DCL and the 2001 Guidance…"

https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf

4.      Defendant Rebecca Chopp ("Chopp") became Chancellor in September 2014. (Exhibit 1, Deposition of Rebecca Chopp dated September 21, 2018 at 28:2-4 ("Chopp Dep."))

5.      Prior to this position, Chopp served as President of Swarthmore College from 2009-2014. (https://www.du.edu/about/leadership/chancellor/biography.

6.      During Chopp's tenure, in 2013 a group of Swarthmore students filed a complaint with OCR alleging the College mishandled allegations of sexual misconduct on campus. (http://www.educationviews.org/swarthmore-accused-of-under-reporting-sexual-assault-crimes/)

7.      Defendant Jean McAllister ("McAllister") was hired as DU's Title IX Coordinator effective June 1, 2015. (Exhibit 2, Deposition of Jean McAllister dated July 20, 2018 at 29:24-30:1 ("McAllister Dep."))

8.      At the time Chopp and McAllister arrived at DU, it was under investigation for two OCR complaints. (Exhibit 1, Chopp Dep. 28:7-10; Exhibit 2, McAllister Dep. 39:7-10)

9.      An April 28, 2015 press release announcing the hiring of McAllister highlighted McAllister's experience "working to address trauma," her focus on "sexual assault, child abuse

and sexual abuse, domestic violence, trauma and victimization…" as well as her status as a "well-known expert in Colorado who has served on many boards and worked with several agencies in the field of sexual assault and victim advocacy." (Exhibit 3, McAllister Dep. Ex. 47)

10.    The press release also referenced her involvement with the Ending Violence Against Women Project, the Colorado Coalition Against Sexual Assault and the Gateway Battered Women's Shelter. (*Id.*)

11.    Prior to taking the position with DU, McAllister had never been a Title IX investigator, and had not written any Title IX policies, manuals, procedures, or handbooks. (Exhibit 2, McAllister Dep. 32:15-33:23)

12.    Prior to 2011, DU's Campus Safety Department investigated allegations of sexual misconduct. (Exhibit 4, Deposition of Kristin Olson dated July 26, 2018 at 41:14-21; 43:5-9 ("Olson Dep."))

13.    After the issuance of the 2011 Dear Colleague Letter, DU's Title IX office took over the role of Campus Safety with respect to investigating sexual misconduct allegations. (Exhibit 4, Olson Dep., 43:14-44:2)

14.    A document used by DU's Center for Advocacy, Prevention and Empowerment ("CAPE") in their training center, a copy of which was located in the Health and Counseling Center breakroom in December 2016, discusses the actions to be taken to ensure gender equality for women only. (Exhibit 35, Affidavit of Ross Artwohl dated November 14, 2018 ("Artwohl Aff."); Exhibit 5, Deposition of Ross Artwohl dated August 17, 2018 at 46:4-47:3 ("Artwohl Dep."); Exhibit 9, Deposition of Eric Butler dated June 20, 2018 at Ex. 27 ("Butler Dep."))

15.    The September 22, 2017 Dear Colleague Letter issued by OCR acknowledged that "Legal commentators have criticized the 2011 Letter and the 2014 Questions and Answers for

placing 'improper pressure upon universities to adopt procedures that do not afford fundamental

fairness.'" https://www.cmu.edu/title-ix/colleague-title-ix-201709.pdf

16.     John Doe matriculated at DU as a freshman in the fall of 2015. (Exhibit 8, DU 47)

17.     DU's Office of Equal Opportunity ("OEO") Policies and Procedures 2015-2016

(the "Policies") governed the investigation process applicable to Doe. (Exhibit 7, DU 1-45)

18.     During the 2015-16 school year, Doe and Roe "discussed the prospect of starting

an exclusive romantic relationship." (Exhibit 8, DU 47)

19.     On the evening of Friday March 4, 2016, Doe and Roe engaged in sexual activity,

in which she was the initiator. (Exhibit 9, Butler Dep. 218:19-21)

20.     On the morning of Saturday, March 5, 2016, sexual contact occurred between Doe

and Roe. (Exhibit 21, DU 127, DU 136, DU 158)

21.     Doe and Roe disagreed as to whether the March 5 contact was consensual. (Exhibit

21, DU 161)

22.     On March 8, 2016, Roe threatened Doe, stating "she had a gun with one bullet in

her hand with perfect aim." (Exhibit 21, DU 137)

23.     Roe's friend A.M., who was not present during the encounter, told Roe that it was

"clear to [her] that [the encounter] was a sexual assault." (Exhibit 18, DU 217-218)

24.     On March 24, 2016, CAPE Advocate Nissa Baker notified DU's Title IX office of

Jane Roe's complaint. (Exhibit 21, DU 121)

25.     On March 24, 2016, Resident Director Natalie Alvarado advised McAllister,

among others, that Roe initially was not going to report the alleged incident but decided to do so

once she learned that Doe "may be having conversations with other people about what occurred

and how it was not a sexual assault..." (Exhibit 11, DU 691)

26.    McAllister did not present this information concerning Roe's motivation for filing the complaint against Doe to Investigators Eric Butler or Siri Slater, which Slater testified would have been important information for an investigator to know. (Exhibit 12, Deposition of Siri Slater dated June 21, 2018 at 248:17-23 ("Slater Dep."))

27.    DU's Policies require that an investigation be "thorough, impartial and fair." (Exhibit 7, DU 31)

28.    Likewise, the Title IX Coordinator was required to remain fair and impartial to both the complainant and the respondent. (Exhibit 2, McAllister Dep. 117:15-19)

29.    By email dated March 24, 2016, prior to having met or spoken with Roe about the allegations, McAllister concluded that Roe "has been sexually assaulted." (Exhibit 13, DU 690)

30.    By email dated March 24, 2016, prior to having met or spoken with Roe about the allegations, McAllister stated: "I understand that you experienced a sexual assault by another DU student. I am very sorry that you had to deal with that experience." (Exhibit 14, DU 682)

31.    While claiming to have no familiarity with Roe, Chopp's name was signed to a letter publicly commending Roe who received an award in 2016, proximate in time to when the investigation was ongoing. (Exhibit 1, Chopp Dep. 7:10-13; Exhibit 15, Chopp Dep. Ex. 75)

32.    Though permitted under DU's policies, at no time did DU issue an interim suspension against Doe or impose any other interim measure, even though Doe and Roe lived in the same dormitory, and on the same floor. (Exhibit 9, Butler Dep. 227:4-15; 228:6-11)

33.    On April 29, 2016, McAllister notified Doe that a DU student "reported concerns" that he "may have engaged in violations of University Policies related to non-consensual sexual contact." (Exhibit 16, P 00180-00181)

34. The notice did not identify the name of the Complainant, the date and location of the alleged incident, the exact behaviors at issue, or the specific policies allegedly violated. (Exhibit 16, P 00180-00181)

35. McAllister provided Doe with support resources including CAPE, despite knowing that "someone who has been accused and is being investigated is not allowed to go to CAPE." (Exhibit 2, McAllister Dep. 44:25-45:2)

36. DU did not have any such similar program dedicated solely to respondents in a Title IX investigation. (Exhibit 2, McAllister Dep. 45:3-5, 18-22)

37. McAllister testified that Doe's mother accompanied Doe to their meeting, and described in detail her physical appearance, stating under oath that she had "100 percent vivid memory of [Doe's mother] being there with him." (Exhibit 2, McAllister Dep. 150:5-19)

38. In fact, Doe's mother did not accompany him to any meeting or interview with DU and has never met Jean McAllister. (Exhibit 17, Declaration of Sally Doe dated November 14, 2018 ("Sally Doe Decl."))

39. Between May 2 and June 1, 2016, Slater and Butler interviewed eleven (11) witnesses identified by Roe, in addition to Doe and Roe. (Exhibit 18, DU 215-252)

40. None of these witnesses were present either immediately before or immediately after the alleged incident, and one was not even a student at DU. (Exhibit 18, DU 215-252)

41. Only after the Preliminary Report was completed did Slater and Butler interview the single witness (Dr. Mary Bricker) out of the five identified by Doe. (Exhibit 21, DU 123)

42. The Investigators "had reservations about interviewing the close friends identified by [Doe]" (Exhibit 21, DU 163) and thus did not interview Doe's roommate, the first person he spoke with immediately after the alleged incident. (Exhibit 12, Slater Dep., 206:19-207:5)

43.     In contrast, the Investigators interviewed at least half a dozen close friends of Jane Roe. (Exhibit 21, DU 161)

44.     The Investigators required Doe to identify the information that his proposed witnesses would provide in order to determine their relevance and whether to interview them. (Exhibit 19, P 00192)

45.     The Investigators did not document any similar requests to Roe before interviewing all 11 of her witnesses. (Exhibit 12, Slater Dep. 207:6-18)

46.     Within the 2,822 pages produced by DU in discovery, the summary judgment record demonstrates that the Investigators requested an explanation as to what information the proposed witnesses would provide from Doe only. (Exhibit 19, P 00192)

47.     Jane Roe underwent a Sexual Assault Nurse Examiner ("SANE") examination on March 8, 2016. (Exhibit 21, DU 184-189)

48.     Jane Roe provided select portions of the SANE examination records to the Investigators, rather than the entire report. (Exhibit 12, Slater Dep. 251:15-22)

49.     The Investigators did not seek an authorization from Roe to release the entire SANE exam, even though they could have done so. (Exhibit 12, Slater Dep. 254:10-15)

50.     A complete SANE report would have included "summaries by the SANE nurse, the attending physician, and the patient's written statement regarding the source of the injuries." (Exhibit 21, DU 162; Exhibit 9, Butler Dep. 303:18-25; 304:1-4)

51.     The Investigators did demand and required an authorization from Doe to speak with his psychologist, Dr. Bricker. (Exhibit 9, Butler Dep. 308:23-309:8; Exhibit 20, DU 876)

52.    The Final Report issued on August 5, 2016 included the Investigators' Findings and Conclusions that Doe "more likely than not" engaged in non-consensual sexual contact with Roe. (Exhibit 21, DU 121-214; Exhibit 22, P 00173-00174)

53.    Despite Jane Roe's release of only a few pages from the SANE examination, the Investigators concluded that the mere "fact that she chose to actually go get a SANE report" was a critical piece of evidence in making their findings. (Exhibit 12, Slater Dep. 223:23-224:3)

54.    The Investigators also afforded substantial weight to the testimony of G.H. (Exhibit 12, Slater Dep. 226:21-24), whom the Investigators considered the "most important witness in this case" (Exhibit 12, Slater Dep. 196:18-22) despite the fact he had no firsthand knowledge of the events and the "only facts that he got were from [Roe]" herself. (Exhibit 12, Slater Dep. 204:1-6)

55.    In discussing G.H.'s account in the Final Report, the Investigators omitted G.H.'s statement that Roe was "trying to get [him] to come back and have intercourse with her later that night," the night after the incident with Doe. (Exhibit 21, DU 144; Exhibit 21, DU 161)

56.    The Investigators concluded in their Final Report that six witnesses agreed that Roe described to them having woken up to Doe fondling her on March 5. (Exhibit 121, DU 158)

57.    However, as testified to by both Investigators, this conclusion was erroneous as three of the six witnesses in fact did not provide any testimony to that effect. (Exhibit 9, Butler Dep. 251:16-257:13; Exhibit 12, Slater Dep. 223:7-18; Exhibit 21, DU 140-141, 142-145)

58.    On August 23, 2016 Olson notified Doe that an Outcome Council held on August 22, 2016 determined "dismissal is the only reasonable outcome." (Exhibit 23, P 00169-00170)

59.    This was unsurprising given every male respondent found responsible for non-consensual sexual contact during McAllister's tenure as Title IX Coordinator from June 2015 to February 2017 was expelled from DU. (Exhibit 2, McAllister Dep. 52:24-53:2)

60.    During McAllister's tenure, not a single woman was expelled from DU for alleged nonconsensual sexual activity. (Exhibit 2, McAllister Dep. 116:19-25)

61.    Doe submitted an appeal on August 30, 2016 based on (i) the existence of a procedural error(s) so substantial that it greatly impacted the findings, responsibility determination, and/or the ultimate outcomes, and (ii) (t)he outcomes imposed were substantially disproportionate to the severity of the violation. (Exhibit 24, P 00131-133)

62.    On September 1, 2016, Associate Provost of Graduate Studies Barbara Wilcots denied the appeal, upholding the findings and sanction of expulsion. (Exhibit 25, P 00164-166)

63.    McAllister, Slater, Butler, and Rutherford (a member of Doe's Outcome Council) attended trauma informed training which instructed that the long-term effects of trauma can affect a person's memory of an event and may therefore result in inconsistencies in a complainant's statement. (Exhibit 12, Slater Dep. 23:10-21; Exhibit 9, Butler Dep. 159:22-160:2; Exhibit 2, McAllister Dep. 61:3-6; 66:1-6; Exhibit 26, Deposition of Matthew Rutherford dated September 28, 2018 at 59:11-16 ("Rutherford Dep."))

64.    DU's policies defined retaliation as "any act or attempt to retaliate against or seek retribution from any individual…involved in the investigation and/or resolution of a report under these Procedures. Retaliation can take many forms, including, but not limited to, abuse or violence, threats, physical intimidation…" The policies note that "Retaliation, intimidation, or attempts of this kind is a violation of the [Policy] and will be subject to sanctions up to and including termination or expulsions." (Exhibit 7, DU 16)

65.    During the investigation, the Investigators learned that Roe threatened Doe with a metaphorical gun and "one bullet and perfect aim." (Exhibit 12, Slater Dep. 267:10-17; Exhibit 9, Butler Dep. 233:1-6)

66.     Roe told Doe that she had the ability to "destroy all his dreams" and that people were telling her she could file a Title IX report and "say she was assaulted." (Exhibit 21, DU 154)

67.     In summarizing this interaction in the Final Report, the Investigators conspicuously omitted the fact that Doe was crying when he reported this incident to his R.A., representing only that Doe was "visibly angry by [Roe's] threats to file a complaint." (Exhibit 21, DU 163)

68.     The Investigators did not perform any investigation to determine whether Roe had a real gun. (Exhibit 12, Slater Dep. 268:2-4)

69.     The Investigators did not perform any investigation to determine whether Roe's report against Doe was retaliatory and thus a violation of DU's policies. (Exhibit 12, Slater Dep. 241:24-242:3; Exhibit 9, Butler Dep. 282:4-283:1)

70.     During the 2015-2016 academic year, DU provided different resources to complainants and respondents; specifically, a respondent was not permitted to go to CAPE, a resource limited to complainants as survivors of sexual assault. (Exhibit 12, Slater Dep. 102:5-9)

71.     Prior to 2015, training programs presented by the OEO concerning Title IX and DU's investigation process referred to the party filing the complaint as the "complainant." (Exhibit 27, DU 2495-2529)

72.     During McAllister's first year as Title IX Coordinator, DU's training programs referred to the party filing the complaint as the "victim" or "survivor" and highlighted the necessity for "validation and belief" of their claims. (Exhibit 28, DU 1621; Exhibit 29, 1609-1629)

73.     During her time as Title IX Coordinator at DU, McAllister subscribed to the belief that one in five women experience sexual assault during college, despite research that has debunked this statistic (Exhibit 2, McAllister Dep. 79:12-18) and was comfortable broadcasting this statistic to the DU campus. (Exhibit 2, McAllister Dep. 80:13-21)

74.    McAllister left DU in February of 2017, due in part to her poor job performance. (Exhibit 2, McAllister Dep. 30:24-25; 264:11-13)

## III.    SUMMARY JUDGMENT STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he movant must demonstrate entitlement (to summary judgment) beyond a reasonable doubt and if an inference can be deduced from the facts whereby the non-movant might recover, summary judgment is inappropriate." *Barber v. General Elec. Co.,* 648 F.2d 1272, 1276 n.1 (10th Cir. 1981) (internal quotations omitted). At the summary judgment stage, the court "may not make credibility determinations or weigh the evidence." *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.,* 245 F.3d 1172, 1175 (10th Cir. 2001) (internal citations omitted). When the opposing party fails to "set out specific facts showing a genuine issue for trial ... summary judgment should, if appropriate, be entered against that party." *Stevens v. Zavares,* No. 2010 WL 1277693, at *4 (D. Colo. Mar. 29, 2010) (internal citations omitted).

## IV.    ARGUMENT- Plaintiff John Doe is entitled to summary judgment on his Title IX-Erroneous Outcome Claim

### i.    The Title IX "Erroneous Outcome" Standard.

Congress enacted Title IX of the Education Amendments of 1972 to supplement the Civil Rights Act of 1964's ban on racial discrimination in the workplace and in universities. "Because the statutes share the same goals and because Title IX mirrors the substantive provisions of Title VI of the Civil Rights Act of 1964, courts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the case law interpreting Title VII." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994); *Gossett,* 245 F.3d at 1176 ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims.") Title IX bars the

imposition of university discipline where gender is a motivating factor in the decision to discipline. *Yusuf*, 35 F.3d at 715.

In *Yusuf*, the Second Circuit held that a plaintiff's challenge to a university disciplinary proceeding on grounds of gender bias can proceed in two principal ways, namely (i) erroneous outcome; or (ii) selective enforcement. A plaintiff making an erroneous outcome claim must first demonstrate "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Yusuf*, 35 F.3d at 715. Next, a plaintiff must "allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* (citations omitted). The *Yusuf* court noted that "[s]uch allegations might include, *inter alia,* statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

The *Yusuf* standard has gained broad acceptance nationally, including in this judicial district. *See Doe v. Univ. of Denver*, 2018 WL 1304530, at *8 (D. Colo. Mar. 13, 2018); *Doe v. Cummins*, 662 F. App'x 437 (6th Cir. 2016); *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016).

### ii. The *McDonnell Douglas* Burden-Shifting Framework Applies to Title IX Gender Discrimination Claims.

The Tenth Circuit has recognized that the framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green* for shifting burdens of proof to establish discriminatory intent in the Title VII context applies to Title IX gender discrimination cases. *See Hiatt v. Colorado Seminary*, 858 F.3d 1307 (10th Cir. 2017) (holding *McDonnell Douglas* burden-shifting framework applies both to Title IX and Title VII sex discrimination claims). The Tenth Circuit described the application of the *McDonnell Douglas* burden shifting framework in the Title IX gender discrimination context in *Gossett v. Oklahoma* as follows: "The creation of a prima facie case gives rise to the presumption that the challenged action was the result of unlawful

discrimination. In order to rebut this presumption, the defendant bears the burden of articulating a facially nondiscriminatory reason for the adverse action." *Gossett*, 245 F.3d at 1176. If defendant meets this burden, the burden then shifts back to the plaintiff to establish that "the legitimate reasons offered by the defendant[s] were not [their] true reasons, but were a pretext for discrimination." *Gossett*, 245 F.3d at 1176–77 (internal citations and quotations omitted).

Here, Plaintiff will present a *prima facie* case that (1) he is male, (2) he was not responsible for the violations for which he was expelled, (3) he was found responsible and sanctioned, (4) the outcome of the proceedings was erroneous, and (5) he has evidence of gender bias. Assuming Defendants will argue that their actions were not motivated by bias and that the outcome was the result of a fair and thorough investigation, Plaintiff will also demonstrate that Defendants' actions were a pretext for discrimination.

To establish pretext for discrimination, a plaintiff can demonstrate either "that a discriminatory reason more likely motivated the defendant's decision or that the [institution's] proffered explanation is unworthy of belief." *Gossett*, 245 F.3d at 1177. As "smoking gun" proof of discrimination is rare, a plaintiff ordinarily uses circumstantial evidence to meet this test. *See Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) ("Circumstantial evidence permits the fact finder to draw a reasonable inference from facts indirectly related to discrimination that discrimination, in fact, has occurred."); *Perry v. Woodward*, 199 F.3d 1126, 1134 (10th Cir. 1999) ("plaintiff can show intentional discrimination either by direct evidence of discrimination or by indirect evidence, employing the burden-shifting framework first articulated in the seminal case of *McDonnell Douglas Corp. v. Green…*")

A claim of pretext need not be supported with direct evidence, but may be based on "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief." *Turner v. Pub. Serv. Co. of Colorado,* 563 F.3d 1136, 1143 (10th Cir. 2009). As detailed below, there is no dispute that Defendants reached an erroneous outcome when they found Doe responsible for violations of DU's policies and that such finding was motivated by a gender bias against male students.

### iii.    The decision finding Plaintiff responsible for a violation of DU's policies was clearly erroneous.

The decision finding Plaintiff responsible for non-consensual sexual contact was erroneous. Not only was the sexual activity between Doe and Roe on the morning of March 5, 2016 consensual, but Roe was also the initiator. On the evening of March 4, 2016, Doe and Roe engaged in sexual activity, in which she was the initiator. (Exhibit 9, Butler Dep. 218:19-21) When they awoke in bed together on the morning of March 5, Roe climbed on top of Doe, initiating sexual activity. When he stopped her to get out of bed and retrieve a condom, rather than leave the room, Roe waited for him to return to the bed at which point she again climbed on top of him and helped to guide his penis into her vagina. (Exhibit 21, DU 136) Subsequently, upon learning that Doe had talked to others about the encounter, Roe became upset and threatened Doe with a metaphorical gun. (Exhibit 21, DU 137) Roe told Doe that she had the ability to "destroy all his dreams" and that people were telling her she could file a Title IX report and "say she was assaulted." (Exhibit 21, DU 154) Shortly thereafter, her complaint was filed with DU's Title IX office. (Exhibit 21, DU 121) Based on the foregoing, the decision finding Doe responsible for a policy violation was clearly erroneous, and could only have been reached as the result of a bias against Doe as the male accused.

### iv.    Gender bias was a motivating factor in DU's decision finding Plaintiff responsible for a policy violation.

1. **The hiring of Chopp in 2014 and McAllister in 2015 in the wake of the 2011 DCL and 2014 Questions and Answers led to a more aggressive handling of sexual misconduct complaints against male students at DU.**

The circumstances ultimately leading to the imposition of an expulsion of Doe began approximately two years prior, in September 2014, when Chopp began her tenure as Chancellor of DU. Prior to arriving at DU, Chopp was President of Swarthmore College where she garnered unfavorable national attention in response to her handling of what she branded the College's "spring of discontent." This turbulent time period, characterized by student activism and criticism on polarizing topics such as the College's handling of sexual assault, erupted in the spring of 2013 when a group of students filed a complaint with OCR, prompting an investigation into the College's handling of sexual misconduct on campus. (http://www.educationviews.org/swarthmore-accused-of-under-reporting-sexual-assault-crimes/) In April 2014, three months after a lawsuit was filed by a male student who alleged he was erroneously found responsible for a Title IX violation and expelled, a decision that Chopp upheld on appeal, Chopp announced that she would be leaving Swarthmore.[1] (Exhibit 1, Chopp Dep. 79:3-6)

On April 29, 2014, the Office for Civil Rights issued its Questions and Answers on Title IX and Sexual Violence to "further clarify the legal requirements and guidance articulated in the DCL and the 2001 Guidance…" (https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf) Chopp began her tenure at DU shortly thereafter, in September 2014, while DU was under investigation by OCR for two complaints filed by female students relating to DU's handling

---

[1] The stipulated dismissal of the complaint filed against Swarthmore stated in part: "After the disciplinary hearing and after consideration of John Doe's original appeal, additional information became available which both Parties believe raises questions about the impartiality of the College Judiciary Committee Panel that heard John's case. On the basis of the new information, John has requested that the College vacate the Panel's findings and sanctions. The College agrees that the new information raises sufficient questions about the fairness of the hearing to warrant vacating the Panel's findings and sanction." (2:14-cv-000532-SD, ECF No. 18)

of their sexual assault complaints. (Exhibit 1, Chopp Dep. 28:7-10) In accordance with the DCL and 2014 Questions and Answers, Chopp sought to make substantial changes to the manner in which DU handled allegations of sexual misconduct. In July 2014, DU engaged Pepper Hamilton to audit of its policies and procedures. (Exhibit 9, Butler Exhibit 26; Exhibit 1, Chopp Dep. 33:23-34:4) One of the recommendations made was to bring in a full time Title IX Coordinator with sufficient authority and resources to oversee a new Title IX office. (Exhibit 34, Pepper Hamilton Audit Report, May 25, 2015) This led to the hiring of victim's advocate McAllister.

On April 28, 2015, Vice Chancellor of Human Resources Amy King announced the hiring of McAllister as DU's first Title IX Coordinator, effective June 1, 2015. (Exhibit 3, McAllister Dep. Ex. 47). King highlighted McAllister's experience "working to address trauma," her focus on "sexual assault, child abuse and sexual abuse, domestic violence, trauma and victimization, offender dynamics, secondary trauma intervention and policy development," as well as her status as a "well-known expert in Colorado who has served on many boards and worked with several agencies in the field of sexual assault and victim advocacy." (Exhibit 3, McAllister Dep. Ex. 47). King also referenced her involvement with the Ending Violence Against Women Project, the Colorado Coalition Against Sexual Assault and the Gateway Battered Women's Shelter. (*Id.*) Prior to taking the position with DU, McAllister had never been a Title IX investigator, and had not written any Title IX policies, manuals, procedures, or handbooks. (Exhibit 2, McAllister Dep. 32:15-33:23)

### 2. McAllister evidenced a gender bias when she presumed Doe responsible.

While DU's policies require that the Title IX Coordinator remain fair and impartial to both complainant and respondent (Exhibit 2, McAllister Dep. 117:15-19), McAllister demonstrated her partiality towards Roe from the outset. On March 24, 2016, prior to having met or spoken with

Roe about the allegations, McAllister concluded that Roe "has been sexually assaulted." (Exhibit 13, DU 690) and acknowledged "I understand that you experienced a sexual assault by another DU student. I am very sorry that you had to deal with that experience." (Exhibit 14, DU 682)

McAllister's confirmation of Roe's account was not surprising given her proclamation that false reports are rare (Exhibit 2, McAllister Dep. 53:3-11), her belief that one in five women experience sexual assault despite well-accepted research debunking this statistic, (Exhibit 2, McAllister Dep. 79:19-25) and her ingrained use of the terms "survivor" and "victim" to identify those that have filed complaints alleging sexual misconduct prior to any investigation being performed. While acknowledging the term "survivor" and "victim" should "not be used by a university in anything to do with a Title IX investigation" (Exhibit 2, McAllister Dep 85:15-19), McAllister nevertheless routinely used such terms in her correspondence related to Doe's investigation as well as in training materials. For instance, in a training presented to DU faculty, she referred to complainants as "survivor" and "victim" and highlighted the need for "validation and belief" of their claims. (Exhibit 28, DU 1621; Exhibit 29, DU 1609-1629) This despite the Chancellor of DU testifying that an investigation should not use the term "victim" until a decision was made" (Exhibit 1, Chopp Dep. 63:4-6); the investigators should not use the word "victim" (Exhibit 1, Chopp Dep. 63:21-22); and the Title IX Coordinator should not use the term "victim" when describing the investigation process during their seminars (Exhibit 1, Chopp Dep. 64:2-7), all of which occurred here.

Notwithstanding her claims that she acted impartially in her role as Title IX Coordinator and did not presume the female complainant to always be telling the truth, McAllister's blatantly false statements made under oath should cause this Court to view the entirety of her testimony with doubt. Incredibly, McAllister confirmed her "absolute recollection" of having met with Doe's

mother, and testified that she had "100 percent vivid memory" of Doe's mother accompanying

him to their meeting. (Exhibit 2, McAllister Dep. 191:21-24) She even went so far as to describe

her physical appearance (Exhibit 2, McAllister Dep. 150:5-19), as well as the substance of their

conversation. (Exhibit 2, McAllister Dep. 191:1-20) In fact, Doe's mother did not once appear

with Doe for any meeting or proceeding at DU and has never met McAllister. (Exhibit 17, Sally

Doe Decl. ¶¶ 4-10) Thus, McAllister's testimony as a whole should be disregarded, particularly

her assertion that she carried out her responsibilities in an impartial manner and did not harbor a

bias against male students accused of misconduct.

### 3. Decisions made and actions taken during the investigation process were a pretext for discrimination and attributable to gender bias against Doe.

First, McAllister's lack of experience with university disciplinary proceedings and innate

bias against accused males was evident in the manner in which she materially tainted the

investigation, manipulating an adverse finding against Doe. Specifically, as early as March 24,

2016, McAllister learned that Roe was motivated to file the complaint against Doe because she

learned that Doe may have been "having conversations with other people about what occurred and

how it was not a sexual assault..." (Exhibit 11, DU 691) Yet, McAllister either negligently at best,

or intentionally at worst, failed to provide this critical information to the Investigators. Slater

testified this would have been important information for an investigator to know. (Exhibit 12,

Slater Dep. 248:17-23) McAllister's concealment of Roe's clear and retaliatory motive for filing

the complaint resulted in its omission from the Final Report, and consequently from the Outcome

Council's consideration, as their knowledge concerning the case was limited to the Final Report.

(Exhibit 26, Rutherford Dep. 85:16-21) Outcome Council Member Molly Hooker testified that "it

would be troubling if anybody was deliberately hiding facts" (Exhibit 31, Deposition of Molly

Hooker dated September 21, 2018 at 135:1-9 ("Hooker Dep.")) and expressed she would "hope

the motive of a complainant would be sorted out during the investigation…" (Exhibit 31, Hooker Dep. 134:1-3) Olson agreed that the motive of a complaining witness could be important to know as this could cast some doubt on the complainant's statement. (Exhibit 4, Olson Dep. 196:2-15)

Second, the Investigators accepted Jane Roe's mere submission to a SANE examination as evidence corroborating her claims of misconduct notwithstanding that Roe disclosed only select portions of the examination records to the Investigators. (Exhibit 12, Slater Dep. 251:15-22) Dismissing the significance of the remainder of the report which included summaries from the SANE nurse, the attending physician and most importantly, Roe's written statement, the Investigators nonsensically determined that "any speculation regarding what might be found in those documents does not outweigh the value of the concrete information in the sections that have been provided to the Investigators." (Exhibit 21, DU 162) The Investigators did not seek an authorization from Roe to release the entire report, even though they could have done so (Exhibit 12, Slater Dep. 254:10-15) since they deemed it proper to allow Roe to cherry pick what documents to provide. (Exhibit 12, Slater Dep. 251:24-252:5) While acknowledging that they "lack the medical expertise to visually assess the injuries," the Investigators still believed themselves fit to make the determination that the abrasions and contusions noted in the limited portions of the SANE report that were produced "would reasonably seem to corroborate [Roe's] assertion that [Doe] was "manipulating" her body…" (Exhibit 21, DU 162) Yet, this baseless conclusion failed to consider the possibility that the claimed abrasions and contusions were caused by another source, such as a fall while Roe was intoxicated the night prior to the alleged incident, since the Investigators never explored this possibility. (Exhibit 9, Butler Dep. 315:18-21)

Third, the Investigators demonstrated a clear bias against Doe when they arbitrarily deemed every witness identified by Roe to be relevant while dismissing Doe's witnesses as duplicative.

Between May 2 and June 1, 2016, Slater and Butler interviewed eleven (11) witnesses identified by Roe notwithstanding that none of these witnesses were present either immediately before or immediately after the alleged incident and one was not even a student at DU. (Exhibit 18, DU 215-252) In stark contrast, only following the issuance of the Preliminary Report did the Investigators interview the single witness (Dr. Bricker) out of the five identified by Doe. (Exhibit 21, DU 123) By letter dated August 30, 2016, Dr. Bricker expressed her concerns about the quality of the interview performed by Slater which was conducted "in a rote manner that suggested she was simply getting the task done...[I] got the impression that she had no interest or idea about asking anything that might shed any new light on the investigation. She had no curiosity about any parts of the story; perhaps she had made up her mind already about what she thinks took place." (Exhibit 18, DU 266-267). Affirming Dr. Bricker's perception, Slater subsequently presented Dr. Bricker with a summary of her statement that was inaccurate and "may reflect bias on the part of the investigator." (*Id.*) Specifically, Dr. Bricker was precise in referring to Roe as a "young woman"; however, Slater misrepresented Dr. Bricker's statement when her summary referred to Roe as a "girl," suggesting that she was young, naïve, "more vulnerable and powerless" (*Id.*); this choice of language perpetuated DU's presumption that Doe was the male aggressor.

While the Investigators expressed "reservations about interviewing the close friends identified by [Doe]" (Exhibit 21, DU 163), no such similar reservations were present when they interviewed at least half a dozen close friends of Jane Roe. (Exhibit 21, DU 161) In determining which witnesses to interview, Slater testified that the Investigators would not interview witnesses who would provide "duplicative information." (Exhibit 12, Slater Dep. 208:5-9; 275:19-21). Yet, witness G.H.- who lacked any independent knowledge of the alleged incident, was not present at any relevant time, and only repeated the account reported to him by Jane Roe- was deemed to be

the most compelling witness in reaching a finding of responsibility against Doe. (Exhibit 21, DU 161; Exhibit 9, Butler Dep. 256:19-23)

Moreover, the Investigators imposed different obligations on Roe and Doe when they required Doe to identify the specific information that his proposed witnesses would provide in order to determine their relevance. (Exhibit 19, P 00192) The Investigators did not document any such similar requests made to Roe before interviewing all 11 of her witnesses. This disparate treatment afforded the parties with respect to the collection of witness information can only be attributable to a gender bias against the male accused, and revealed an effort to reach a predetermined finding of responsibility against Doe. There is no other plausible explanation for knowingly declining to interview the one witness with whom Doe spoke immediately after the alleged incident (Exhibit 12, Slater Dep. 206:19-207:5), while choosing to interview numerous friends of Roe's who failed to provide any independent knowledge of the events at issue. (Exhibit 21, DU 161; friends merely provided "repeated reiterations of [Roe's] account.")

Fourth, the Investigators demonstrated a bias based on Doe's gender when they failed to investigate his complaint of retaliation. DU's policies defined retaliation as "any act or attempt to retaliate against or seek retribution from any individual…involved in the investigation and/or resolution of a report under these Procedures. Retaliation can take many forms, including, but not limited to, abuse or violence, threats, physical intimidation…" The policies note that "Retaliation, intimidation, or attempts of this kind is a violation of the [Policy] and will be subject to sanctions up to and including termination or expulsions." (Exhibit 7, DU 16)

Here, the Investigators learned that Roe had threatened Doe with a metaphorical gun and "one bullet and perfect aim." (Exhibit 12, Slater Dep. 267:10-17; Exhibit 9, Butler Dep. 233:1-6) Roe also told Doe that she had the ability to "destroy all his dreams" and that people were telling

her she could file a Title IX report and "say she was assaulted." (Exhibit 21, DU 154) Doe immediately thereafter went to his Resident Assistant to report this incident. (Exhibit 21, DU 154) The Investigators did not perform any investigation to determine whether Roe had a real gun (Exhibit 12, Slater Dep. 268:2-4) or whether Roe's filing of a Title IX complaint against Doe was retaliatory and thus a violation of DU's policies. (Exhibit 12, Slater Dep. 241:24-242:3) Had the roles been reversed and Doe, a male student, made a threatening gesture toward Roe, a female student, claiming he had a gun and "perfect aim," there is no question that DU would have taken this threat seriously and at a minimum, investigated the circumstances or reported it to Campus Safety. The Investigators' failure to take any action in response to this threat reveals their innate belief, stemming from archaic stereotypes of differing characteristics between males and females, that a female cannot be an aggressor. This same belief was reflected in DU's ultimate finding that Doe was the aggressor, despite an acknowledgement that Roe initiated the sexual activity between them the evening prior to the alleged incident. (Exhibit 12, Slater Dep. 97:21-25)

Fifth, a bias against males accused of misconduct is revealed through DU's use of the investigative model which consisted of the Investigators interviewing witnesses and collecting evidence and then preparing a final report summarizing their conclusions. The final report was then submitted to an Outcome Council, which would assign a sanction commensurate with the findings of the investigators. While DU's policies identified the specific criteria to be considered in issuing an appropriate sanction, any such reasoned analysis was a farce as every male student found responsible for non-consensual sexual contact between June 2015 and February 2017 was expelled. In this way, the Outcome Council in Doe's case served as a mere rubber stamp; as soon as it received the Final Report finding Doe responsible for non-consensual sexual contact, the resultant sanction was inevitable.

Finally, the biased nature of the investigation was reflected in the manner in which the Investigators misrepresented the testimony of Roe's witnesses to manufacture evidence corroborative of Roe's claims. Specifically, the Investigators concluded that six witnesses confirmed that Roe described to them having woken up to Doe fondling her on the morning of March 5. (Exhibit 21, DU 158) However, as testified to by both Slater and Butler, this statement was clearly untrue as three of the six witnesses did not provide any testimony to that effect. (Exhibit 9, Butler Dep. 251:16-257:13) The foregoing calls into question not only their ability to perform a thorough investigation, but also their impartiality in the process. The errors outlined herein demonstrate such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions…" as to render DU's decision finding Doe responsible to be "unworthy of belief" and thus, a pretext for discrimination. *Gossett*, 245 F.3d at 1177.

### 4. The training materials utilized by DU promoted a female victim centered investigation process and presumption of guilt against the male accused.

The training materials utilized by DU to publicize its compliance with Title IX and educate the University community on its policies and procedures further contributed to the gender biased atmosphere against male respondents, and to the erroneous finding in John Doe's case. Prior to 2015, training programs offered by the OEO concerning Title IX and DU's investigation process referred to the party filing the complaint as the "complainant" and dedicated considerable attention to interactions with the respondent. (Exhibit 27, DU 2495-2529) With the arrival of McAllister in 2015, DU's Title IX training turned its focus toward supporting the "victim" or "survivor" and validating their claims. (Exhibit 28, DU 1621; Exhibit 29, DU 1609-1629) For instance, all administrators involved in DU's Title IX program, including McAllister, Slater, Butler, and Rutherford attended trauma informed investigative training, a victim centered approach focused on the effects trauma has on a person's memory of an event, which can result in inconsistencies in

a complainant's statement. (Exhibit 12, Slater Dep. 23:10-21; Exhibit 9, Butler Dep. 159:22-160:2;

Exhibit 2, McAllister Dep. 61:3-6; 66:1-6; Exhibit 26, Rutherford Dep. 58:10-14) Such changes

reflected McAllister's beliefs that false reports are rare (Exhibit 2, McAllister Dep. 53:3-11) and

that one in five women experience sexual assault during college. (Exhibit 2, McAllister Dep.

79:12-18) Given the bias of any single individual who plays a meaningful role in a disciplinary

process may taint the ultimate outcome, there is no question that the administrators involved in

this case influenced the erroneous finding against Doe. *See Back v. Hastings On Hudson Union*

*Free Sch. Dist.*, 365 F.3d 107, 125-26 (2d Cir. 2004).

### 5. The disparate nature of the support resources offered to female complainants in comparison to male respondents further reflects DU's gender biased views.

When McAllister first notified Doe on April 29, 2016 that he was the respondent in a Title

IX investigation, she provided him with a list of support resources. The list included CAPE, despite

McAllister's knowledge that "someone who has been accused and is being investigated is not

allowed to go to CAPE." (Exhibit 2, McAllister Dep. 44:25-45:2) DU did not have any such similar

program dedicated solely to respondents in a Title IX investigation (Exhibit 2, McAllister Dep.

45:3-5, 18-22) as CAPE was limited to complainant survivors of sexual assault. (Exhibit 12, Slater

Dep. 102:5-9) While respondents may have been afforded other resources in the DU community,

the exclusion of respondents, the majority of whom have been male, from the CAPE office

reflected the disparate treatment afforded female complainants and male respondents at DU.

Title IX is a non-discrimination statute that does not justify procedurally defective and

biased tribunals who treat females as "victims" presumptively telling the truth, whose

inconsistencies can be explained away by "trauma" and males as rapists unlikely to be telling the

truth. Critical analysis of the totality of the circumstances leads to the conclusion that DU's

erroneous decision finding Doe responsible for non-consensual sexual contact was motivated by a

gender bias against male students. As there are no remaining questions of material fact, this Court

should grant Plaintiff John Doe's motion for partial summary judgment on his Title IX-Erroneous

Outcome claim.

## V.    CONCLUSION

Based on the foregoing, Plaintiff John Doe respectfully requests that this Court grant his

Partial Motion for Summary Judgment on his Title IX-Erroneous Outcome claim against

Defendants in its entirety.

Dated this 16th day of November, 2018.

        Respectfully Submitted,

*/s/ Tara J. Davis, Esq.*
*[e-filing – November 16, 2018]*
_____
Andrew T. Miltenberg, Esq.
Stuart Bernstein, Esq.
Tara J. Davis, Esq.
Nesenoff & Miltenberg, LLP
363 7th Avenue, Fifth Floor
New York, New York 10001
212-736-4500
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
tdavis@nmllplaw.com

      -and-

*/s/ Michael J. Mirabella*
*[e-filing – November 16, 2018]*
_____
Michael J. Mirabella, Esq.
Campbell Killen Brittan & Ray
270 St. Paul Street, Suite 300
Denver, CO 80206
303-322-3400(ph)
MMirabella@ckbrlaw.com

*Attorneys for Plaintiff John Doe*

## CERTIFICATE OF SERVICE

I certify that on the 16th day of November, 2018, I served a true and correct copy of the

forgoing **PLAINTIFF JOHN DOE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

by filing through ECF, the Court's official electronic filing system, which will provide notice to

the following:

**CONTANGY, BROOKS, SMITH & PROPHETE, LLP**
**Jim Goh**
**Rayner Mangum**
**600 17th Street, Suite 2700S**
**Denver, Colorado 80202**
**Telephone: 720-343-7570**
**Facsimile:   720-343-7571**
**jgoh@constangy.com**
**rmangum@constangy.com**

*Attorneys for Defendants*

                                        */s/ Tara J. Davis*
                                        Tara J. Davis, Esq.