IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 17-cv-01962-PAB-KMT

JOHN DOE,

      Plaintiff,

v.

UNIVERSITY OF DENVER,
UNIVERSITY OF DENVER BOARD OF TRUSTEES,
REBECCA CHOPP, individually and as agent for University of Denver,
KRISTIN OLSON, individually and as agent for University of Denver,
JEAN McALLISTER, individually and as agent for University of Denver,
SIRI SLATER, individually and as agent for University of Denver, and
ERIC BUTLER, individually and as agent for University of Denver,

      Defendants.

_____

**ORDER**
_____

This matter is before the Court on Plaintiff John Doe's Motion for Partial Summary Judgment [Docket No. 70], Defendants' Motion for Summary Judgment [Docket No. 71], Defendants' Unopposed Motion for Leave to Submit Supplemental Authority [Docket No. 93], and Plaintiff's Motion for Leave to Submit Supplemental Authority [Docket No. 94]. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

## I.  BACKGROUND[1]

Plaintiff John Doe enrolled as an undergraduate student at the University of

_____

[1]The following facts are undisputed unless otherwise noted. The magistrate judge previously granted plaintiff permission to proceed under the pseudonym "John Doe" for purposes of this lawsuit. Docket No. 7. Additionally, this order will refer to the complainant as "Jane Roe."

Denver ("DU"), a private, not-for-profit university, in the fall of 2015.  Docket No. 71 at 2,

¶¶ 1-2.  On March 24, 2016, a DU resident assistant gave notice to DU's Office of Title

IX that, on March 5, 2016, plaintiff subjected Jane Roe to non-consensual sexual

contact.  *Id.* at 3, ¶ 4.  Ms. Roe had visited a hospital on or around March 8, 2016 to

obtain a forensic examination from a sexual assault nurse examiner ("SANE").  *Id.* at 3,

¶ 5.  DU's then-Title IX coordinator, Jean McAllister, sent Ms. Roe an email on March

24, 2016 stating, "I understand that you have experienced a sexual assault by another

DU student.  I am very sorry that you had to deal with that experience."  Docket No. 70

at 5, ¶ 30.  Ms. McAllister met with Ms. Roe on April 4, 2016 to discuss the resources

available to her and her options for reporting.  Docket No. 71 at 3, ¶ 6; Docket No. 71-4

at 2.  Ms. Roe requested a formal investigation on or around April 11, 2016.  Docket

No. 71 at 3, ¶ 7.

An investigation commenced on April 22, 2016, led by Office of Equal

Opportunity ("OEO") investigators Eric Butler and Siri Slater.  *Id.*, ¶ 8.  On April 29,

2016, Ms. McAllister sent plaintiff a letter stating that "a DU student has reported

concerns that you may have engaged in violations of University Policies related to non-

consensual sexual contact."  Docket No. 70 at 5, ¶ 33; Docket No. 71 at 4, ¶ 11.  The

letter informed plaintiff of his rights and attached a list of resources available to him.

Docket No. 71 at 4, ¶ 11.  The list of resources included counseling services and the

University chaplain.[2]  *Id.*  The next week Ms. McAllister met with plaintiff for an

---

[2]Plaintiff denies that the letter contained "respondent-specific" resources.  Docket
No. 80 at 3, ¶ 11.  He does not, however, deny that the list of resources included
counseling services and the University chaplain.  *Id.*

informational meeting.  *Id.*, ¶ 12.  Ms. McAllister again informed plaintiff of resources

available to him as the respondent.[3]  *Id.*

Between May 2 and June 1, 2016, Mr. Butler and Ms. Slater interviewed eleven

witnesses identified by Ms. Roe.  Docket No. 70 at 6, ¶ 39.  None of these witnesses

were present immediately before or immediately after the incident.  *Id.*, ¶ 40.  Plaintiff

and Ms. Roe were also interviewed.  *Id.*, ¶ 39.

On May 23, 2016, Mr. Butler emailed plaintiff to inform him that the investigators

anticipated finishing interviews that week and asked plaintiff if he had any other

information he would like considered.  Docket No. 71 at 6, ¶ 26.  The investigators

issued a preliminary report to plaintiff on June 7, 2016.  *Id.* at 7, ¶ 29.  Plaintiff and Ms.

Roe were given until June 22, 2016 to review the preliminary report and to submit

additional information.  *Id.*, ¶ 31.  Plaintiff responded that he had no additional

information, but was disappointed that the investigators did not interview any of the five

people he had listed in his interview statement [Docket No. 71-24].  *Id.*, ¶ 33; Docket

No. 71-10 at 2.  Ms. Slater responded that two of the individuals he sought to have

interviewed – his mother and his lawyer – were not appropriate to be interviewed

because they were "identified as [plaintiff's] support people and ha[d] been privy to all

the communications that ha[d] taken place during this case."  Docket No. 71 at 8, ¶ 36;

Docket No. 71-11 at 4.  Ms. Slater stated that the other two individuals were not

interviewed because the investigators "did not find that they could give us any more

relevant information than [the investigators] already had and chose not to bring them

_____

[3]Defendant again denies that McAllister provided plaintiff "respondent-specific"
resources.  Docket No. 80 at 3, ¶ 12.

into this." Docket No. 71-10 at 2.  The investigators agreed to interview plaintiff's

psychologist, Dr. Mary Bricker.  Docket No. 71 at 8, ¶ 37.  On July 18, 2016, the

investigators made the amended preliminary report available for plaintiff to review.  *Id.*

at 9, ¶ 39.  Plaintiff requested no changes.[4]  *Id.*, ¶ 40.

On August 16, 2016, Mr. Butler informed plaintiff that the investigators found it

"more likely than not that [plaintiff] engaged in non-consensual sexual contact with [Ms.

Roe] in her residence hall bedroom on the morning of March 5, 2016."  *Id.*, ¶ 41.  Kristin

Olson, DU's Director of Student Conduct, sent a letter to plaintiff on August 18, 2016

stating that, because the OEO found him responsible for violating DU's non-consensual

sexual contact policy, an Outcome Council would be convened.  *Id.* at 10, ¶ 43.  The

letter identified the members of the Outcome Council – Ms. Olson, Molly Hooker, and

either Ryan Buller or Matthew Rutherford – and informed plaintiff that he "could object

to the participation of a member of the Outcome Council based on a demonstrable

significant bias."  *Id.*  There is no allegation that plaintiff objected.  The Outcome

Council convened on August 22, 2016, *id.* at ¶ 45, and determined that, due to the

nature and severity of plaintiff's actions, dismissal from DU was the "only reasonable

outcome."  *Id.*  Plaintiff was informed of this decision by telephone and by letter on

August 23, 2016.  *Id.* at 11, ¶ 46.

Plaintiff appealed this decision on August 30, 2016.  *Id.* at 11, ¶ 47.  He argued

that the investigation contained "procedural errors so substantial that it greatly impacted

---

[4]Plaintiff states that, while he did not request any changes be made, he also
expressed to the investigators that he felt the investigation had not been fair to him.
Docket No. 80 at 6, ¶ 40.

the findings, responsibility determination, and/or the ultimate outcomes" and that "[t]he

outcomes imposed [were] substantially disproportionate to the severity of the violation."

Docket No. 71-15 at 2.  On September 1, 2016, DU's Associate Provost of Graduate

Studies, Barbara Wilcots, sent plaintiff a letter informing him that his appeal was denied

and providing the reasons for the denial.  Docket No. 71 at 11, ¶ 48; Docket No. 71-16

at 4.  The letter stated that this was "a final decision, with no further route of appeal."

*Id.*[5]

Plaintiff filed this lawsuit on August 15, 2017.  Docket No. 3.  He asserts claims

for (1) violation of his rights under Title IX of the Education Amendments of 1972,

20 U.S.C. § 1681 *et seq.*; (2) violation of his procedural due process rights under the

Fourteenth Amendment of the U.S. Constitution pursuant to 42 U.S.C. § 1983; (3)

breach of contract; (4) breach of the covenant of good faith and fair dealing; (5)

promissory estoppel; and (6) negligence.  Docket No. 3 at 46-59.

On November 16, 2018, plaintiff filed a motion for partial summary judgment on

his Title IX claim.  Docket No. 70.  The same day defendants filed a motion for

---

[5]The parties dispute whether defendants Rebecca Chopp, the Chancellor of DU, and Ms. McAllister had any input into the outcome of plaintiff's investigation. Defendants contend that Chancellor Chopp had no involvement in plaintiff's investigation, outcome determination, or appeal.  Docket No. 71 at 11, ¶ 49.  Plaintiff disagrees, stating that the testimony cited by defendants to support the allegation "does not support [their] contention that Chancellor Chopp had no involvement in [plaintiff's] case."  Docket No. 80 at 7, ¶ 49.  Plaintiff puts forth no evidence, however, that Chancellor Chopp had any involvement in plaintiff's case.  Moreover, plaintiff asserts that Ms. McAllister "provided no input into the outcome of [plaintiff's] investigation." Docket No. 71 at 11, ¶ 50.  Defendant counters that Ms. McAllister "influenced the outcome of [plaintiff's] investigation when she failed to disclose Roe's retaliatory motive for filing the complain against [plaintiff] to the Investigators.  Docket No. 80 at 7, ¶ 50. This allegation is discussed below.

summary judgment on all claims.  Docket No. 71.  On March 5, 2019, defendants filed a

motion for leave to submit supplemental authority.  Docket No. 93.  Plaintiff filed a

motion for leave to submit supplemental authority on June 22, 2019.  Docket No. 94.

## II.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when

the "movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson*

*v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if

under the relevant substantive law it is essential to proper disposition of the claim.

*Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes

over material facts can create a genuine issue for trial and preclude summary

judgment.  *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An

issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a

verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial,

it may satisfy its burden at the summary judgment stage by identifying a lack of

evidence for the nonmovant on an essential element of the nonmovant's claim."

*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal

quotation marks omitted) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671

(10th Cir. 1998)).  "Once the moving party meets this burden, the burden shifts to the

nonmoving party to demonstrate a genuine issue for trial on a material matter."

*Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. When considering a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.* However, where, as here, there are cross motions for summary judgment, the reasonable inferences drawn from affidavits, attached exhibits, and depositions are rendered in the light most favorable to the non-prevailing party. *Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004). Furthermore, "[w]hen the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (internal quotation marks omitted).

## III. ANALYSIS

Each party argues that it is entitled to summary judgment on plaintiff's Title IX claim. *See* Docket No. 70 at 11; Docket No. 71 at 12. Defendants also argue that they are entitled to summary judgment on plaintiff's Fourteenth Amendment claim and his state law claims. Docket No. 71 at 17-18.

### A.  Title IX Claim

Plaintiff argues that he is entitled to summary judgment on his Title IX claim

because the decision finding him responsible for non-consensual sexual contact was an

"erroneous outcome" that was motivated by defendants' gender bias against him.

Docket No. 70 at 14.  Defendants argue that summary judgment is warranted in their

favor because "the undisputed facts show[] there is no evidence that sexual bias was a

motivating factor behind DU's investigation of [plaintiff] and its determination that he

violated campus policy."  Docket No. 71 at 13.  Because each party raises substantially

the same arguments in its motion for summary judgment and its response to the

opposing party's motion for summary judgment, the Court will address the cross-

motions together.[6]

Title IX of the Civil Rights Act states that "[n]o person in the United States shall,

on the basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or activity receiving Federal

financial assistance."  20 U.S.C. § 1681(a).  In *Yusuf v. Vassar College*, 35 F.3d 709

(2d Cir. 1994), the seminal case addressing Title IX claims based on the imposition of

university discipline, the Second Circuit identified two categories of claims brought by

"[p]laintiffs attacking a university disciplinary proceeding on grounds of gender bias": (1)

claims of "erroneous outcome," where the plaintiff alleges that he or she "was innocent

---

[6]Plaintiff filed a motion to submit supplemental authority [Docket No. 94] and
asks the Court to consider a recent decision from another district.  Although plaintiff
provided a copy of the document to the Court, it is unclear from the Court's review that
this decision is intended to be publicly accessible, as it is not available on online
databases and the issuing court's public CM/ECF docket.  For this reason, the Court
denies plaintiff's motion to submit supplemental authority.

and wrongfully found to have committed an offense"; and (2) claims of "selective enforcement," where the plaintiff "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* at 715; *see also Doe v. Univ. of Colo.*, 255 F. Supp. 3d 1064, 1073-74 (D. Colo. 2017) (recognizing "erroneous outcome" and "selective enforcement" theories set forth in *Yusuf*).[7]  Under either theory, the plaintiff must show that "gender [was] a motivating factor in the decision to discipline." *Yusuf*, 35 F.3d at 715; *see also Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d at 1074 ("While some of the elements of the claims are different under these theories, both require that a Plaintiff show that gender bias was a source of the deprivation." (internal quotation marks omitted)).

Plaintiff asserts a Title IX claim under the "erroneous outcome" theory.  *See* Docket No. 70 at 11.  A plaintiff may demonstrate that sexual bias was a motivating factor behind an erroneous outcome through evidence such as "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715; *see also Ruff v. Bd. of Regents of Univ. of N.M.*, 272 F. Supp. 3d 1289, 1299 (D.N.M. 2017); *Doe v. Trustees of Boston College*, 2016 WL 5799297, at *24 (D.

_____

[7]Courts have recognized two additional theories of liability under Title IX, which plaintiff does not assert in this case: (1) "deliberate indifference," under which a plaintiff must "demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct"; and (2) "archaic assumptions," which "has been applied where plaintiffs seek equal athletic opportunities" and "finds discriminatory intent in actions resulting from classifications based upon archaic assumptions." *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638-39 (6th Cir. 2003) (unpublished).

Mass. Oct. 4, 2016), *aff'd in part, vacated in part on other grounds, and remanded in* 892 F.3d 67 (1st Cir. 2018) (discussing types of evidence demonstrating gender bias at the summary judgment stage).  Plaintiff argues that he is entitled to summary judgment on his Title IX claim because "the totality of the circumstances leads to the conclusion that DU's erroneous decision finding [plaintiff] responsible for non-consensual sexual contact was motivated by a gender bias against male students."  Docket No. 70 at 24-25.  Defendants argue that plaintiff has failed to present any evidence showing that sexual bias was a motivating factor behind DU's investigation and expulsion of plaintiff. Docket No. 71 at 13.

Plaintiff argues that five categories of evidence support the entry of summary judgment in his favor on his Title IX claim.  *See* Docket No. 70 at 15-24. Considering plaintiff's evidence as a whole, the Court finds that it does not demonstrate a genuine issue of fact as to whether sexual bias was a motivating factor behind DU's decision to discipline plaintiff.  To prevail on his Title IX claims, "it would not be enough for [plaintiff] to convince a jury that [Roe] received more favorable treatment from [DU] than he did; he would have to prove that the disparity in treatment was due to his gender, rather than his status as a student accused of sexual misconduct."  *King v. DePauw Univ.*, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014).  Simply put, plaintiff has failed to present any evidence that defendants' actions were motivated by sex-based discrimination or a bias against male students.  The Court addresses each of plaintiff's arguments in turn.

### 1.  The hiring of Chancellor Chopp and Ms. McAllister

Plaintiff first argues that DU's hiring of Chancellor Chopp in 2014 and Ms.

McAllister in 2015 "led to a more aggressive handling of sexual misconduct complaints against male students at DU." Docket No. 70 at 15.   He cites Ms. McAllister's and Chancellor Chopp's work histories, highlighting Ms. McAllister's experience working with victims of sexual assault, sexual abuse, and domestic violence and Chancellor Chopp's tenure as president of a different university, during which time the university received criticism for its handling of sexual misconduct allegations. *Id.* at 16.   Beyond noting this experience, however, plaintiff makes no argument that either defendant's prior work history demonstrates an anti-male bias. *See id.* at 15-16.

The hiring of Chancellor Chopp and Ms. McAllister does not demonstrate a bias against male students.[8]   Although plaintiff argues that these hirings "led to a more aggressive handling of sexual misconduct complaints against male students at DU," plaintiff fails to provide any evidence that male students were targeted by defendants in the adjudication of sexual misconduct allegations.   Plaintiff does not show that any purported increase in time, resources, or money spent addressing sexual misconduct was directed only at allegations against male students or allege that any policy change at DU applied to investigations in which male students only were accused of sexual misconduct.   His argument suggests only a more serious handling of sexual misconduct allegations in general.   The purported "more aggressive handling of sexual misconduct complaints" does not support a finding of gender bias, and plaintiff has not

_____

[8]As a preliminary matter, the Court finds that plaintiff has failed to create a genuine dispute of fact as to whether Chancellor Chopp had any meaningful involvement in the investigation.   *See* Docket No. 80 at 7, ¶ 49 (stating that the cited testimony does not support defendants' contention that Chancellor Chopp had no involvement in the case, but citing no supporting evidence).

demonstrated that the more aggressive policy disparately affects complaints filed against men. *See Doe v. Univ. of Colo.*, 255 F. Supp. 3d at 1078 (quoting *King*, 2014 WL 4197507, at *10) (stating that universities are "not responsible for the gender makeup of those who are accused *by other students* of sexual misconduct.").

Further, plaintiff has failed to demonstrate why Chancellor Chopp's experience as president of a university that was criticized for its handling of sexual misconduct allegations or why Ms. McAllister's experience working with victims of sexual assault and domestic violence evidences an anti-male bias. "[T]he fact that [an individual] has experience working with survivors of domestic violence does not establish that she harbors pro-female biases." *Doe v. Univ. of Denver*, 2018 WL 1304530, at *11. Neither does experience working with victims of sexual assault or prior experience handling Title IX claims. Plaintiff's arguments are without merit.

### 2. *Ms. McAllister's emails regarding the investigation*

Next, plaintiff contends that Ms. McAllister demonstrated a gender bias because she "presumed [plaintiff] responsible" and "demonstrated her partiality towards Ms. Roe from the outset." Docket No. 70 at 16. Specifically, plaintiff points to Ms. McAllister's email sent about Ms. Roe in which she stated that Ms. Roe "ha[d] been sexually assaulted," Docket No. 70-13 at 2, as well as Ms. McAllister's email to Ms. Roe at the beginning of the investigation, in which she stated, "I understand that you experienced a sexual assault by another DU student. I am very sorry that you have had to deal with that experience." Docket No. 70-14 at 2. In addition, plaintiff references Ms. McAllister's "routine[] use[]" of the terms "survivor" and "victim" in her correspondence related to plaintiff's investigation as well as in training materials. Docket No. 70 at 17.

12

Plaintiff claims that these emails demonstrate Ms. McAllister's gender bias.[9]

Plaintiff has set forth no argument demonstrating why Ms. McAllister's emails indicate a bias against male students and has presented no legal basis supporting an inference that Ms. McAllister's emails were motivated by gender bias. In fact, Ms. McAllister used this same language expressing sympathy and support in an email sent to a male Title IX complainant. *See* Docket No. 81-2 at 2. Thus, plaintiff's argument that Ms. McAllister's email offering support to Ms. Roe evinces a gender bias fails. *See Doe v. Univ. of Denver*, 2018 WL 1304530, at *10 (rejecting idea that encouraging the reporting of sexual assault and offering support to complainants is inherently discriminatory).

To the extent that plaintiff argues Ms. McAllister presumed that Ms. Roe was telling the truth, "a belief that complainants tell the truth does not reflect gender bias because males can also be victims of sexual assault." *Doe v. Colgate Univ.*, 2017 WL 4990629, at *15 (N.D.N.Y. Oct. 31, 2017), *aff'd*, 760 F. App'x 22 (2d Cir. 2019) (unpublished). Further, use of the terms "victim" and "survivor" do not demonstrate a gender bias. *See Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 955-56 (N.D. Ill.

---

[9]Plaintiff also argues that Ms. McAllister made "blatantly false statements" under oath when she stated that plaintiff's mother had been present at her meeting with plaintiff although, in reality, Ms. McAllister and plaintiff's mother never met. For this reason, plaintiff argues, the Court should view the entirety of Ms. McAllister's testimony with doubt. Docket No. 70 at 17-18. In her deposition, Ms. McAllister did confirm that she had "100 percent vivid memory" of plaintiff's mother being present at the meeting and had "absolute recollection that she came as [plaintiff's] support person." Docket No. 70-2 at 19, 150:5-19; 20, 191:21-24. When informed that plaintiff's mother never attended a meeting, Ms. McAllister testified that she "may have been mistaken" and "could be wrong" because she "did not review [her] notes." Docket No. 81-12 at 9, 275:13-21. The Court does not find that Ms. McAllister made such "blatantly false statements" so as to discredit the entirety of her deposition testimony.

2017) ("[I]f anything, the use of the word 'victim' . . . creates a bias in favor of those who complain of sexual assault, not in favor of females specifically."). Even if Ms. McAllister's emails demonstrate a bias in favor of complainants of sexual assault, they do not demonstrate a bias in favor of women over men. The Court has previously determined that such a bias is not inherently discriminatory. *See Doe v. Univ. of Denver*, 2018 WL 1304530, at *10 (citing *Bleiler v. Coll. of Holy Cross*, 2013 WL 4714340, at *12 (D. Mass. Aug. 26, 2013) ("[E]ven assuming that DU's Title IX training materials and resources indicate preferential treatment of complainants, such evidence does not, standing alone, support an inference of gender bias.")). Plaintiff has failed to demonstrate that, based on Ms. McAllister's emails, defendants harbored an anti-male bias against him. As such, the Court finds that no genuine issue of material fact exists indicating that the emails demonstrate a gender bias.

### 3.  The Title IX investigation

Third, plaintiff asserts that the investigation process as a whole demonstrates defendants' gender bias against male respondents. *See* Docket No. 70 at 18. Plaintiff presents a substantial number of arguments purporting to demonstrate defendants' gender bias in the investigation itself. He first claims the investigators demonstrated a bias when they interviewed eleven witnesses identified by Ms. Roe, but only one of the five witnesses identified by plaintiff, *id.* at 20, and argues that his witness, Dr. Bricker, was given only a cursory interview and was misquoted in the summary report. *Id.* at 21. Next, plaintiff states that the fact that the investigators accepted and considered an incomplete SANE examination report and allowed Ms. Roe to choose which parts of the

report were disclosed demonstrates a gender bias.  *Id.* at 19.  Second, plaintiff argues

that Ms. McAllister failed to report information to the investigators regarding Ms. Roe's

potential motivation for filing the complaint and argues that investigators failed to

investigate plaintiff's claims that Ms. Roe had threatened him with a gun.  *Id.* at 19, 21.

Third, plaintiff argues that DU's investigation and sanctions process is biased against

men because "every male student found responsible for non-consensual sexual contact

between June 2015 and February 2017 was expelled."  *Id.* at 22.  Finally, plaintiff

argues that the investigation demonstrates an anti-male bias because the investigators

erroneously stated that six students corroborated Ms. Roe's allegation that she woke up

to plaintiff fondling her, when only three students actually corroborated this allegation.

*Id.* at 23.

What plaintiff fails to establish, however, is a connection between any of these

perceived flaws in the investigation and an anti-male bias on the part of defendants.

Without this causal connection, plaintiff cannot prevail.  *See Haley v. Virginia Com.*

*Univ.*, 948 F. Supp. 573, 578 (E.D. Va. 1996) ("[I]t is not sufficient for [the plaintiff] to

prevail on his Title IX claim for him to prove that the finding of his guilt or his allegedly

severe punishment resulted from procedurally or otherwise flawed proceedings.

Rather, he must show a causal connection between the allegedly flawed outcome and

the alleged gender bias.").  The Court will address each of plaintiff's arguments

regarding perceived flaws in the investigation.

### a.  Witnesses interviewed

Although plaintiff argues a gender bias is shown by the investigators' failure to

interview four of the five witnesses he proffered, two of the requested interviewees were his mother and his attorney, who the investigators deemed inappropriate to interview for the investigation, and two were deemed to not have relevant information.  *See* Docket No. 71-11 at 4; Docket No. 71-10 at 2.  Once again, plaintiff fails to demonstrate that the investigators did not interview his witnesses because of an anti-male bias.  Further, to the extent that plaintiff argues that Dr. Bricker was misrepresented in the witness report, the Court finds this argument unpersuasive.  Plaintiff argues that Dr. Bricker referred to Ms. Roe as a "young woman" during her interview with investigators, but states that Ms. Slater misrepresented this statement in the interview summary by quoting Dr. Bricker as having referred to Ms. Roe as a "girl."  Docket No. 70 at 20. Plaintiff argues this misrepresentation "suggest[s] that [Roe] was young, naive, 'more vulnerable and powerless," and that "this choice of language perpetuated DU's presumption that [plaintiff] was the male aggressor."  *Id.*  The Court finds that the interchanging of the words "young woman" and "girl" is so insignificant that it cannot demonstrate a gender bias.  *See Haley*, 948 F. Supp. at 578.  Further, Ms. Slater testified that she could not remember why she used the word "girl," but stated it could have been because it would have been quicker to type out.  Docket No. 81-17 at 11, 237:4-23.  There is no indication that Ms. Slater's use of the word "girl" in her summary was in any way discriminatory or had any effect on the outcome of the investigation. The Court finds that this is insufficient evidence of gender bias by defendants.

### b.  SANE report

As to the investigators' reliance on an incomplete SANE report and their failure

to request a full report, plaintiff sets forth no argument that the extent to which the SANE report was used during the investigation somehow presents an inference of gender bias to support his Title IX claim.  *See* Docket No. 70 at 19.  Ms. McAllister stated that it is the generally understood best practice to not request the full SANE report from the complainant, as the full reports contain private information, including protected medical information and photographs, which the Title IX office is then required to show to the respondent.  Docket No. 81-12 at 10, 289:20-290:16.  Thus, not only is there no evidence of a gender bias, there is a reasonable explanation for the investigators' failure to request a full SANE report.  Plaintiff has not provided sufficient evidence to establish that the use of the SANE report creates an inference of gender bias.

### c.  Roe's motivation

Plaintiff also argues defendants demonstrated a bias when Ms. McAllister did not report to the investigators Ms. Roe's statement that she chose to report the misconduct because plaintiff had been "having conversations with other people about what occurred and how it was not a sexual assault."  Docket No. 70 at 4, ¶ 25.  Further, plaintiff contends that "the Investigators learned that Ms. Roe had threatened [plaintiff] with a metaphorical gun and 'one bullet and perfect aim,'" *id.* at 21-22, and that gender bias is evident because the investigators "did not perform an investigation to determine whether Roe had a real gun."  Docket No. 70 at 22.  He argues that "[h]ad the roles been reversed and [plaintiff], a male student, made a threatening gesture toward [Ms.] Roe, a female student, claiming he had a gun and 'perfect aim,' there is no question that DU would have taken this threat seriously and at a minimum, investigated the

17

circumstances or reported it to Campus Safety." *Id.* According to plaintiff, the investigators' failure to do so "reveals their innate belief, stemming from archaic stereotypes of differing characteristics between males and females, that a female cannot be an aggressor." *Id.*

The information about Ms. Roe's conversations with other students was forwarded to Ms. McAllister via email by the director of plaintiff's and Ms. Roe's residence hall. Docket No. 70-11 at 2. The email concerned the reason why the dormitory's resident assistant did not make a sexual assault report. *Id.* In her deposition, Ms. McAllister stated that she did not forward the email to the investigators because she knew that the investigators planned to interview Ms. Roe and the resident advisor and "trusted that they would be able to get this information from the contact they had with the two involved people." Docket No. 81-12 at 10, 289:13-15. Aside from arguing that Ms. McAllister has an "innate bias against accused males," plaintiff has set forth no argument why this demonstrates gender bias. The failure to forward this email to the investigators is insufficient evidence of Ms. McAllister's gender bias. "A plaintiff must be able to adduce substantial evidence to support his contentions; a mere iota of evidence, followed by conclusory allegations of discriminatory intent, will not suffice." *Haley*, 948 F. Supp. at 578.

As to the investigators' failure to investigate purported threats made by Ms. Roe against plaintiff, the Final Investigative Report indicates that, on March 10, 2016, Ms. Roe went to speak to plaintiff about the incident. Although she expressed her concern to plaintiff about the effect that filing a Title IX report could have on him, she told him that she "felt like [she] was holding a metaphorical gun with one bullet in it." Docket No.

81-1 at 14.  Plaintiff states that Ms. Roe "said that she had a gun with one bullet in her hand with perfect aim.  That conversation was what she could say and what she had the power was [sic]."  *Id.* at 18.

Beyond plaintiff's speculative argument regarding the investigators' "innate belief[s]" regarding whether women can be aggressors, plaintiff has failed to demonstrate why it was the duty of the Title IX investigators, who were tasked with investigating whether non-consensual sexual contact occurred, to investigate whether Ms. Roe "had a real gun" instead of a "metaphorical gun."  Moreover, to the extent that plaintiff argues the investigators failed to look into plaintiff's statement about the gun and whether this evidenced retaliation, this information is included in the final report, which indicates it was considered.  *See* Docket No. 71-4 at 14, 18; *see also Doe v. Univ. of Denver*, 2018 WL 1304530, at *11 ("That the investigators ultimately found Ms. Doe's story to be more credible does not demonstrate that they 'failed to consider' exculpatory information," as the information was included in the final report).  Plaintiff has failed to demonstrate that any failure to investigate was the result of gender bias and not the fact that such an investigation would be outside of the Title IX investigators' scope of responsibilities.

### d.  Sanctions resulting from DU's investigations

Plaintiff's argument that DU's Title IX investigatory process is biased against men because all of the male students found responsible for non-consensual sexual contact between June 2015 and February 2017 were expelled is unavailing.  If anything, this fact demonstrates the seriousness of the misconduct, not any bias

against male respondents.  "Absent evidence that women have received lesser sanctions for similar conduct," the expulsion of male students found responsible for non-consensual sexual contact does not demonstrate a bias against male students. *See Doe v. Univ. of Denver*, 2018 WL 1304530, at *11 (quoting *Yusuf*, 35 F.3d at 715)).

### e.  Corroborating evidence

Finally, plaintiff contends that "the biased nature of the investigation was reflected in the manner in which the Investigators misrepresented the testimony of Roe's witnesses to manufacture evidence corroborative of Roe's claims."  Docket No. 70 at 23.  Here, plaintiff refers to the fact that, in the final report, the investigators stated that six witnesses had corroborated Ms. Roe's allegation that she woke up to plaintiff fondling her on the morning of March 5, 2016.  *See* Docket No. 81-1 at 39.  In fact, only three witnesses corroborated this statement.  Docket No. 70 at 8, ¶ 57; Docket No. 81 at 6, ¶ 57.  Mr. Butler and Ms. Slater acknowledged in their depositions that this was a mistake made by conflating the accusations of fondling with the accusations of penetration.  *See* Docket No. 70-9 at 9, 251:16-21; Docket No. 81-17 at 8, 218:12-21. Plaintiff, however, fails to connect this error to gender bias and does not argue that, but for this error, the investigators would have found him not responsible for non-consensual sexual contact.  The Court finds that there is no genuine issue of material fact demonstrating that defendants' investigation was grounded in bias favoring women and against men.

### 4.  DU's Title IX training materials

Plaintiff argues that DU's training materials "promote[] a female victim centered

investigation process and presumption of guilt against the male accused," which contributes "to the gender biased atmosphere against male respondents."  Docket No. 70 at 23.  Specifically, plaintiff takes issue with the use of the terms "victim" and "survivor," this time when used in DU's Title IX training programs.  *Id.*  He also objects to the Title IX training's focus on validating complainants' claims, arguing that this practice demonstrates a bias against men.  *Id.*  Further, plaintiff notes that all of DU's Title IX administrators, including Ms. McAllister, Ms. Slater, Mr. Butler, and Mr. Rutherford, attended "trauma informed investigative training," which, according to plaintiff, is a victim-centered training about the effect that trauma may have on an individual's memory of an event, which can result in inconsistencies in the complainant's statement.  *Id.* at 23-24.

The argument regarding the use of the terms "victim" and "survivor" has already been rejected by the Court, and the remainder of plaintiff's arguments are also without merit.  Plaintiff fails to explain why the training's "victim-centered approach" or the fact that some individual defendants participated in such victim-centered training demonstrates a bias against male students, given that men, like women, can be victims of sexual assault.  *Doe v. Colgate Univ.*, 2017 WL 4990629, at *15.  Nor does plaintiff explain how a gender bias can be born out of training that instructs university officials that trauma may have an impact on the memory of a sexual assault victim, male or female.  "Facially gender-neutral sexual misconduct policies . . . do not create an inference of gender bias."  *Id.  See also Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 478 (S.D.N.Y. 2015) (finding that university sexual misconduct policy that was "entirely gender neutral" provided no evidence of gender bias).  Therefore, the Court finds that

21

there is no genuine issue of material fact as to whether DU's training materials demonstrate an anti-male bias, and such an argument cannot support plaintiff's motion for summary judgment.

### 5.  *The resources provided in a Title IX investigation*

Finally, plaintiff argues that "[t]he disparate nature of the support resources offered to female complainants in comparison to male respondents further reflects DU's gender biased views."  Docket No. 70 at 24.  Although plaintiff acknowledges that he was provided a list of resources, he takes issue with the fact that the list of available resources included the Center for Advocacy and Prevention and Empowerment ("CAPE").  *Id.*  CAPE is a resource for victims of sexual assault.  Docket No. 81 at 20; Docket No. 70-2 at 8, 44:13-19.  Plaintiff argues this is inherently discriminatory because Ms. McAllister stated in her deposition that "[s]omeone who has been accused and is being investigated is not allowed to go to CAPE" because "[t]he services are dedicated to victim survivors."  Docket No. 70-2 at 8-9, 44:23-45:8; Docket No. 70 at 24.  Plaintiff also alleges that "DU did not have any such similar program [to CAPE] dedicated solely to respondents in a Title IX investigation" and that "the exclusion of respondents, the majority of whom have been male, from the CAPE office reflect[s] the disparate treatment afforded female complainants and male respondents at DU."  Docket No. 70 at 24.

Plaintiff cannot establish that the resources provided to the complainant and respondent in a Title IX investigation establish an inherent gender bias.  As the Court held in *Doe v. University of Denver*, "[t]hat some of those resources were 'complainant specific' does not support an inference of gender bias."  2018 WL 1304530, at *10.  At

22

best, plaintiff sets forth an argument that the resources available to a Title IX

complainant are larger in number than those resources available to a respondent.  But

plaintiff has set forth no legitimate argument tying this purported disparity to a gender

bias.  Plaintiff's statement that "the exclusion of respondents, the majority of whom

have been male, from the CAPE office reflected the disparate treatment afforded

female complainants and male respondents at DU" is unavailing.  Plaintiff has not

alleged that male complainants are not allowed to seek assistance through CAPE and

has not argued that female respondents have been permitted to access CAPE

resources.  Plaintiff has done nothing more than demonstrate "the reality that the

majority of complainants of sexual misconduct are female and the majority of

respondents are male." *Doe v. Univ. of Denver*, 2018 WL 1304530, at *10.  *See also*

*Yu*, 97 F. Supp. 3d at 480 ("That an alleged victim of sexual misconduct would receive

help from a counselor cannot reasonably be seen as a marker of anti-male gender

bias.").

In summary, the Court finds that plaintiff has failed to demonstrate that he is

entitled to summary judgment on his Title IX erroneous outcome claim because he

cannot establish that gender was a motivating factor in the disciplinary decision.  *Yusuf*,

35 F.3d at 715.  For this same reason, plaintiff has failed to demonstrate a genuine

issue of material fact that would preclude entering summary judgment in favor of

defendants.  As a result, defendants are entitled to summary judgment on plaintiff's

Title IX claim.

### B.   Fourteenth Amendment Due Process Claim

Defendants argue that they are entitled to summary judgment on plaintiff's Fourteenth Amendment Due Process claim because defendants are not state actors and plaintiff cannot establish such a close nexus between the state and the challenged action so as to support a finding of state action.  Docket No. 71 at 17-18.

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving  "any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  It is well established that the Due Process Clause applies only to state actors.  *See Browns v. Mitchell*, 409 F.2d 593, 594 (10th Cir. 1969) (stating that "[i]t is axiomatic that the due process provisions of the Fourteenth Amendment proscribe state action only"); *see also Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (noting "line between state action subject to Fourteenth Amendment scrutiny and private conduct (however exceptionable) that is not").  However, courts have recognized an exception to this rule when "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."  *Id.* (internal quotation marks omitted).  Such a nexus may be found where (1) the "challenged activity . . . results from the State's exercise of coercive power"; (2) "the State provides significant encouragement, either overt or covert" for the challenged activity; (3) the "private actor operates as a willful participant in joint activity with the State"; (4) a "nominally private entity . . . is controlled by an agency of the State"; (5) the private entity "has been delegated a public function by the State"; and (6) the private entity is "entwined with

24

governmental policies." *Id.* at 296.

Plaintiff argues that there are genuine issues of material fact, particularly regarding whether DU was transformed into a state actor, that preclude summary judgment on his § 1983 Fourteenth Amendment claim.  Docket No. 80 at 16.  Plaintiff's claim hinges upon the Department of Education's Office for Civil Right's ("OCR") issuance of an April 4, 2011 "Dear Colleague" letter ("DCL").  The DCL sought to provide "additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence."  Russlynn Ali, Assistant Sec'y for Civil Rights, *Dear Colleague Letter*, at 2 (Apr. 4, 2011), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html (last visited August 20, 2019).  It also identified "remedies that schools and OCR [could] use to end such conduct, prevent its recurrence, and address its effects."  *Id.*  Another court in this district has noted that the DCL "had two major effects": (1) "it generally signaled that OCR had adopted a 'get tough' approach, thus prompting colleges and universities to devote more attention to sexual assault accusations"; and (2) it "announced OCR's view that school investigators should apply a preponderance-of-the-evidence standard when determining whether a sexual assault accusation is founded."  *Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d at 1067.

Plaintiff contends that the issuance of the DCL "delegated to [DU] the traditional public function of the state in adjudicating sexual assault, creating a 'close nexus between the state and the challenged action' such that ostensibly private behavior 'may be fairly treated as that of the state itself.'"  Docket No. 80 at 18.  Plaintiff's argument is

similar, but not identical, to the argument made in *Doe v. Univ. of Denver*, 2018 WL 1304530, at *6 (finding that the DCL and its requirement that universities comply with Title IX to receive federal funding was not sufficiently coercive to establish a nexus between the state and the challenged action).  Although plaintiff does not argue that the conditioning of federal funds on Title IX is sufficiently coercive as to constitute state action, he argues that the DCL "delegated to universities . . . the traditional public function of the state in adjudicating sexual assault," which raises a question of whether defendants are state actors "in the context of campus sexual misconduct proceedings." Docket No. 80 at 18.

Despite plaintiff's contention that the so-called delegation of state power to a private actor creates a sufficiently close nexus between the state and the challenged action, the Court finds that plaintiff is essentially making an argument under the public function doctrine.  "[A] private entity that exercises 'powers traditionally exclusively reserved to the State' is engaged in state action."  *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974)).  Determining whether the state has delegated to a private party a power that is traditionally exclusively reserved to the states is "an arduous standard to satisfy."  *Johnson v. Rodrigues*, 293 F.3d 1196, 1203 (10th Cir. 2002).  It "often involves situations . . . when private parties . . . [take actions] considered to be equivalent to state action."  *Id.*  "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'"  *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978).

Contrary to plaintiff's assertion, the DCL did not delegate to universities the "traditional public function of the state in adjudicating sexual assault" and did not delegate to defendants an action "considered to be equivalent to state action."  Plaintiff has failed to establish that the DCL delegated to universities the "traditional public function of the state in adjudicating sexual assault" because the actions taken by DU here are not equivalent to state action in adjudicating sexual misconduct.  A university's Title IX investigation into alleged sexual misconduct is separate and distinct from criminal adjudication of sexual misconduct, which is not supplanted by the university's investigation.  A university's Title IX investigation involves university-specific policies and university-specific sanctions and, therefore, cannot "be fairly treated as that of the State itself." *Brentwood Academy*, 531 U.S. at 295.  *See* Docket No. 71-2 at 35-36, 39-40 (DU's OEO procedures stating that once an investigation concludes, the OEO will "issue a letter of determination indicating whether or not a policy violation occurred" and providing a number of sanctions available in the event a violation did occur, ranging from a warning to dismissal from the university).

The language of the DCL supports such a finding.  The DCL repeatedly indicates that a Title IX investigation is not the equivalent of a criminal investigation.  *See, e.g., Dear Colleague Letter* at 10 ("[B]ecause the standards for criminal investigations are different, police investigations or reports are not determinative of whether sexual harassment or violence violates Title IX.  Conduct may constitute unlawful sexual harassment under Title IX even if the police do not have sufficient evidence of a criminal violation.  In addition, a criminal investigation into allegations of sexual violence does not relieve the school of its duty under Title IX to resolve complaints promptly and

equitably.").  Indeed, Title IX is "a remedy Congress has deemed appropriate to make available despite knowing full well that state civil and criminal remedies exist."  *Doe v. The Rector and Visitors of George Mason Univ.*, 179 F. Supp. 3d 583, 590, n.16 (E.D. Va. Apr. 14, 2016) (stating that a complainant's redress for alleged sexual misconduct "is not limited to Title IX, as state criminal and civil remedies" are available).  Courts in other districts have held that a university does not engage in a public function by disciplining its employees under university policies.  *See Collins v. Northwestern Univ.*, 164 F. Supp. 3d 1071, 1077 (N.D. Ill. 2016) (finding that university's human resources department did not act under color of state law when disciplining employees for university policy violations); *cf. Woytowicz v. George Washington Univ.*, 327 F. Supp. 3d 105, 116 (D.D.C. 2018) (finding that professor had failed to sufficiently allege that the university defendant had engaged in a traditionally exclusive governmental function by conducting Title IX investigation); *see also Tsuruta v. Augustana Univ.*, 2015 WL 5838602, at *2 (D.S.D. Oct. 7, 2015) ("The courts that have considered this issue appear to agree that private colleges are not state actors by virtue of their adoption of Title IX grievance procedures") (citing cases).  The same reasoning applies to a university disciplining its students.  Because plaintiff cannot establish a genuine factual dispute as to whether DU is a state actor for purposes of the Fourteenth Amendment, defendants are entitled to summary judgment on plaintiff's due process claim.

### C.   State Law Claims

Plaintiff's remaining claims arise under state law.  *See* Docket No. 3 at 55-59.  Although the Court may exercise supplemental jurisdiction over state law claims if there

is a jurisdictional basis for doing so, 28 U.S.C. § 1367(c)(3) provides that a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  The Tenth Circuit has instructed that, "if federal claims are dismissed before trial, leaving only issues of state law," courts should "decline to exercise pendent jurisdiction . . . absent compelling reasons to the contrary."  *Brooks v. Gaenzle*, 614 F.3d 1213, 1229-30 (10th Cir. 2010) (brackets, internal citations, and internal quotation marks omitted).  This rule is consistent with "[n]otions of comity and federalism," which "demand that a state court try its own lawsuits."  *Id.* at 1230 (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995)).

Plaintiff does not argue that the Court should retain jurisdiction over his state law claims if his federal claims are dismissed, and the Court does not find any compelling reason to do so.  Accordingly, plaintiff's third, fourth, fifth, and sixth claims for relief will be dismissed without prejudice.  *See Thompson v. City of Shawnee*, 464 F. App'x 720, 726 (10th Cir. 2012) (unpublished) (holding that, when declining to exercise supplemental jurisdiction over state-law claims, court "had discretion either to remand the claims to the state court or to dismiss them"); *see also* Colo. Rev. Stat. § 13-80-111 (permitting claims properly commenced within the statute of limitations to be re-filed if involuntarily dismissed because of lack of jurisdiction); *Artis v. District of Columbia*, 138 S. Ct. 594, 598 (2018) (holding that 28 U.S.C. § 1367(d) tolls the statute of limitations for state law claims asserted under § 1367(a) during the pendency of the federal litigation in which such claims are brought and for thirty days following involuntary dismissal of those claims on jurisdictional grounds).

29

## IV.  CONCLUSION

For these reasons, it is

**ORDERED** that Defendants' Unopposed Motion for Leave to Submit

Supplemental Authority [Docket No. 93] is **GRANTED**.  It is further

**ORDERED** that Plaintiff's Motion for Leave to Submit Supplemental Authority

[Docket No. 94] is **DENIED**.  It is further

**ORDERED** that Plaintiff John Doe's Motion for Partial Summary Judgment

[Docket No. 70] is **DENIED**.  It is further

**ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 71] is

**GRANTED IN PART** and **DENIED IN PART**.  It is further

**ORDERED** that plaintiff's first and second claims for relief are dismissed with

prejudice.  It is further

**ORDERED** that plaintiff's third, fourth, fifth, and sixth claims for relief are

dismissed without prejudice.  It is further

**ORDERED** that, within 14 days of the entry of this order, defendants may have

their costs by filing a Bill of Costs with the Clerk of the Court.  It is further

**ORDERED** that this case is closed.


DATED August 20, 2019.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
Chief United States District Judge